UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DAWN WEST, | * |
| | * |
| | *  C.A. No.: |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| COMMUNITY HEALTH CENTER OF, | * |
| CAPE COD AND KAREN GARDNER, | * |
| | * |
| Defendants. | * |

## COMPLAINT

Plaintiff, Dr. Dawn West, hereby files this complaint to recover for racial discrimination and retaliation.

## PARTIES

1.      Dr. Dawn West is an individual who resides at 66 Landfall, Falmouth, Massachusetts.

2.      Community Health Center of Cape Cod ("CHCCC") is an entity with a principal place of business located at 107 Commercial Street, Mashpee, Massachusetts.

3.      Karen Gardner is an individual who acts as the Chief Executive Officer of the CHCCC.

## JURISIDICTION AND VENUE

4.      Jurisdiction over this matter exists pursuant to 28. U.S.C. § 1331

5.      Venue is appropriate pursuant to 28 U.S.C. § 1392 (b)

ALLEGATIONS

6.     Dr. West is an African-American female.  She served as the Director of Dental Services for the Defendant, "CHCCC".  She had been employed by CHCCC since July 2012.  Ms. Gardner terminated Dr. West on December 16, 2016.

7.     Dr. West graduated from the Boston University Goldman School of Dental Medicine in May 1990.  She is licensed to practice dentistry in the Commonwealth of Massachusetts.

8.     She has served previously as Dental Director at two other community health centers, Mattapan Community Health Center and Dimock Community Health Center in Roxbury.  She currently holds faculty appointments at the Harvard University School of Dental Medicine, the Boston University Goldman School of Dental Medicine, and Tufts University School of Dental Medicine.

9.     Throughout the twenty-six years that Dr. West has practiced dentistry, she has dedicated herself to public health, serving the neediest members of society, treating medically complex patients, and working with students to instill in them an appreciation for public health and underserved patient populations.  Dr. West was recognized nationally for her work with HIV patients, she has received a Distinguished Alumni Award from Boston University for "Outstanding Service to the Community," and was elected a Fellow of the American Academy of Dental Science.

10.     Defendant, Karen L. Gardner ("Ms. Gardner"), is the Chief Executive Officer of CHCCC and had been Dr. West's direct supervisor.  Defendant, CHCCC, had been Dr. West's employer.  CHCCC employs over 200 individuals among its three locations.

## DISCRIMINATORY CONDUCT

11.     Ms. Gardner had engaged in a continuous pattern of disparate treatment

designed to discriminate as to Dr. West while she had been employed at CHCC.

Examples of such conduct include the following.

### Ms. Gardner Referred to Ds. West as a "Monkey" During an Unwarranted Negative Evaluation Process.

12.     During her July 2016 evaluation meeting with Ms. Gardner, Ms. Gardner

provided Dr. West with unfavorable grades.  She then made the egregiously

discriminatory remark to Dr. West that Ms. Gardner "could teach a monkey to do your

(Dr. West's) job."

13.     In her annual evaluation of July 2015, Dr. West also received from Ms.

Gardner negative grades and comments for the first time in her career as a dentist.  Ms.

Gardner indicated in her meeting with Dr. West about this evaluation that she would not

issue a new contract to Dr. West at the expiration of her previous contract on July 2,

2015.  On information and belief, Dr. West remains the only dentist or doctor at CHCCC

without an employment contract.

### Criticism as to Dr. West Obtaining Advantageous Grant.

14.     In September - October 2014, the Massachusetts League of Community

Health Centers contacted Dr. West soliciting the CHCCC's participation in a grant

intended to facilitate development of a model of oral health integration into primary care.

The grant would be of great benefit to the Community Health Center.

15.     Despite the fact that Dr. West made no binding commitment about the

grant without first speaking with Ms. Gardner, without any basis whatsoever, she berated

Dr. West for expressing interest in the grant.  Ms. Gardner wrongfully characterized the

3

grant as "stupid" and involving too little money. Ms. Gardner yelled at Dr. West repeatedly, demeaning Dr. West for even accepting a telephone call about the grant. No other director of a service at CHCCC or any other member of the administrative staff, all of whom are white except for Dr. West, had been treated in this manner about a grant or any other issue by Ms. Gardner.

16. Ms. Gardner, however, accepted the grant. She then refused to allow Dr. West to participate on the grant team. Instead, she insisted that Dr. West assign another substantially less experienced and knowledgeable dentist to the grant team. No basis supported such a decision.

### Failure to Pay Dr. West.

17. Dr. West worked as a provider on Saturday, February 7, 2015. The practice and policy of CHCCC is to pay an extra stipend ($300 in the case of Dr. West) to dental providers who work on Saturdays. Contrary to this practice and policy, Ms. Gardner had refused to pay Dr. West the stipend. Ms. Gardner had paid the stipend to white employees.

18. During a meeting on February 27, 2015, Dr. West asked Ms. Gardner again why she was not being paid for work on Saturday and why Ms. Gardner did not speak directly to her about this issue, rather than to one of Dr. West's subordinate employees. Ms. Gardner told Dr. West that she would not be paid because she was not originally scheduled to work that day (she filled in for another provider). This contention had been senseless.

4

19. During this same February 27th meeting, Ms. Gardner criticized Dr. West's performance, noting falsely that the dental clinic was losing money under her leadership.

20. In reality, the revenue the dental clinic produces helps to subsidize the operations of other departments and Dr. West ranks among the top revenue producers at the dental clinic. She has succeeded in doing this despite her administrative responsibilities and despite the fact that her father suffered a severe stroke on July 1, 2015 and died on August 30, 2015. Dr. West also had been battling a reoccurrence of breast cancer between September 2015 and January 2016.

<u>Refusal to Assign Dr. West to Medical Director as Had All Other Practitioners.</u>

21. In or around March 2015, Dr. West proposed to Ms. Gardner that the Medical Director for CHCCC, Dr. Tager, become Dr. West's direct supervisor, in the hope of minimizing further hostile contact with Ms. Gardner. Ms. Gardner refused the request. In the summer of 2016, Ms. Gardner reorganized the reporting structure at the CHCCC to place all clinical services under Dr. Tager's direct supervision, except for Dr. West.

<u>Failure to Receive Raises.</u>

22. Dr. West received no pay raise or bonus in July 2015, despite the fact that all other members of the administrative staff (generally referred to as "senior management" by Ms. Gardner) received a raise and some received a bonus as well. Dr. West is the only non-white individual among senior management at CHCCC.

<u>Failure to Provide Paid time Off When Father Had Been Terminally Ill.</u>

23.     During the period of her father's illness and eventual death and during her surgery and subsequent treatments for breast cancer, Dr. West was told by Ms. Gardner that she would have to use accrued Paid Time Off (PTO) time for any absence in excess of one hour, despite Dr. West's status as an exempt employee under the Fair Labor Standards Act and despite Ms. Gardner's offer to Dr. West's white male counterpart, Medical Director Dr. David Tager, that he use "comp time" instead of PTO time to help care for his wife who is battling cancer as well.

24.     On information and belief, other members of senior management (including Ms. Gardner, HR Director Joanne Mazar, and Chief Financial Officer Ann-Marie Richard) often take time off in excess of one hour without recording that time as PTO.

<u>Unwarranted and Baseless Criticisms and Discriminatory Treatment.</u>

25.     During nearly every interaction between Ms. Gardner and Dr. West from early 2015 to the present, Ms. Gardner has voiced unwarranted, unexplained, and generalized criticisms to Dr. West, such as "you just don't get it", "I just don't trust you", "I need a senior manager, not a dental director", "you're losing money", and the like.

<u>Transferring Dr. West to a Remote Site to Banish Her.</u>

26.     Ms. Gardner then embarked on a campaign to transfer only Dr. West to a small space at the existing Falmouth clinic.  Ms. Gardner attempted to staff the location with temporary, portable dental equipment, at what would have been a significant expense to CHCCC, simply to banish Dr. West from her sight.

27.     Ms. Gardner's plan, however, met with resistance from the architects with whom she was working and from the Department of Public Health.  Accordingly, Ms. Gardner had been prevented from banishing Dr. West to a remote site.

Reduced Compensation.

28.     Dr. West received a 2% pay raise in August 2016 on a "take it or leave it" basis according to Ms. Gardner.  Over the 2015 -2016 raise periods, all other senior managers received higher increases in their compensation.

Other Discriminatory Treatment.

29.     During Dr. West's employment Ms. Gardner has engaged in other disrespectful activities seemingly intended to create a racially intolerable and hostile work environment for Dr. West.  That conduct includes, without limitation, the following:

a.  Repeatedly suggesting that Dr. West look elsewhere for employment;
b.  Altering the plans for the satellite location to which Ms. Gardner intends to send Dr. West to include only one dental chair so as to isolate Dr. West and make the location unsuitable for the productive practice of dentistry;
c.  Usurping Dr. West's authority as to scheduling of dental providers;
d.  Hiring dental staff without Dr. West's input and sometimes without Dr. West's knowledge and over Dr. West's evidence-based objections;
e.  Directing dental operatory assignments;
f.   Bypassing Dr. West and speaking directly with Dr. West's staff; and
g.  Generally mismanaging Dr. West's department to the detriment of Dr. West's reputation and credibility among her staff and throughout CHCCC and in a manner completely unlike her treatment of Dr. West's white senior management colleagues.

30.     On October 18, 2016, Dr. West met with Ms. Gardner and expressed both how much she loves her job at CHCCC generally, but how hurtful it was that Ms. Gardner has engaged in discriminatory treatments.  Dr. West noted that unlike Ms. Gardner's treatment of white practitioners, Ms. Gardner has engaged in simply

7

unwarranted conduct and has made baseless accusations. Ms. Gardner denied none of this and instead stated over and over again that Dr. West should look for another job.

<u>Efforts to Demote or Discharge Dr. West.</u>

31.     On November 2, 2016, Ms. Gardner asked Dr. West to interview a relatively new white male dentist as a possible replacement for Dr. West as Dental Director without first (or subsequently) indicating to Dr. West that she was being demoted. Dr. West had no knowledge of this interview or that Ms. Gardner had been seeking to demote her.

<u>Retaliation</u>

32.     Following the submission of Dr. West's MCAD complaint on November 15, 2016 Ms. Gardner then began to retaliate against Dr. West based on her filing of the charges.

33.     Ms. Gardner became conspicuously more aggressive in her demands of Dr. West. Ms. Gardner also had been seething whenever Dr. West encountered her.

34.     Ms. Gardner called Dr. West before work (as early as 6:30 a.m.) on a couple of occasions (e.g. November 30th, December 2nd, and December 5th) to arbitrarily demand that Dr. West prepare some document or complete some work that same day.

35.     This involved new issues which Ms. Gardner abruptly decided to blame Dr. West after she had filed her MCAD complaint. Ms. Gardner never had made such demands in the past.

36.     Ms. Gardner also did not intend to fire Dr. West prior to Dr. West's MCAD filing. She made that decision because Dr. West filed her MCAD Complaint.

37.     During the meeting on December 16, 2016 at which she fired Dr. West, Ms. Gardner stated that it had been a very difficult 30 days for her because of the filing of Dr. West's MCAD complaint.

38.     Ms. Gardner then offered three baseless reasons as to events occurring after the filing of the MCAD complaint which she stated justified Dr. West's termination.

39.     Ms. Gardner then stated that stolen supplies had been the result of a faculty storage system had been in place.

40.     That statement had been false.

41.     Dr. West had identified the thief whom Ms. Gardner never even investigated.

42.     Ms. Gardner also blamed Dr. West for sending uncensored e-mails to her husband's computer only so she could work on cases as home.

43.     Dr. West had engaged in this behavior for at least several years absent any complaint.

44.     Even more significant is the fact that she had informed the Health Center years earlier that Dr. West would sometimes use her husband's email account to send information from the Health Center to herself.  Dr. West also had told the Health Center's IT staff.

45.     This staff included the person later named C.O.O. by Karen Gardner.

46.     Dr. West informed IT of this because Dr. West often worked at home and frequently had trouble accessing the Health Center remotely.

47.     Despite such knowledge, Dr. West was not cautioned against doing this until a December 14, 2016 training session at which time such conduct had been mentioned for the very first time.

48.     Ms. Gardner also attributed to Dr. West a mistake which had been made by a student on December 2, 2016.

49.     This contention simply is untrue and unfounded as Ms. Gardner knew.

50.     Dr. West played no role as to the mistake which had been innocent in any event.

51.     Dr. West always also had implemented appropriate policies as to orienting students and as to all other issues as well.

52.     In fact, with respect to such policies, Dr. West had supplied those to Ms. Gardner long before this incident.  Ms. Gardner never objected or cited any deficiencies.

53.     None of these stated reasons for termination had been valid.  None even had been mentioned before the filing of the MCAD complaint.

Count I
((Violation of 42 U.S.C. § 1981 Racial Discrimination)

54.     Plaintiff incorporates the allegations of Paragraphs 1 through 53 as if fully set forth herein.

55.     Ms. Gardner and CHCC harassed and terminated Dr. West only because she is an African American.

56.     No legitimate or justifiable business reason existed to warrant termination.

57.    As a result of the discrimination, Dr. West has suffered loss of income and other damages.[1]

## Count II
### ((Violation of 42 U.S.C. § 1981; Hostile Work Environment)

58.    Plaintiff incorporates the allegations of Paragraphs 1 through 57 as if fully set forth herein.

59.    Ms. Gardner and CHCC harassed and terminated Dr. West only because she is an African American.

60.    No legitimate or justifiable business reason existed to warrant termination.

61.    As a result of the discrimination, Dr. West has suffered loss of income and other damages.

WHEREFORE, Dr. West prays that the Court:

1.  Enter judgment in favor of Dr. West and against Defendant on Count I in an amount to be determined at trial.

2.  Enter judgment in favor of Dr. West and against Defendant on Count II in an amount to be determined at trial.

3.  Award Dr. West punitive damages.

4.  Award Dr. West his attorney's fees.

5.  Award Dr. West interest and costs, which include attorney's fees.

6.  Award such other and further relief as the court deems appropriate.

---

[1] Dr. West will amend to submit a discrimination and retaliation claims under Mass. Gen. Laws Ch. 151B. She recently has filed a revised MCAD complaint alleging a charge as to retaliation. After ninety days or sooner if the defendants assent, Dr. West will remove the claim and add it to this case.

PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.

DAWN WEST,

By her attorney,

LAW OFFICE OF
CHRISTOPHER J. TROMBETTA

/s/ Christopher J. Trombetta
Christopher J. Trombetta (BBO No. 556923)
121 North Main Street, Suite 12
Mansfield, MA  02048
(508) 339-5900
chris@trombettalaw.com

Dated:  November 9, 2017